I'm going to begin whenever you're ready. Good afternoon, Your Honors. May it please the Court. Thomas Lane, Winston Strawn in New York. It's a beautiful courthouse, happy to be here. Also here is my client, the CEO of PNY. With respect to this case, Your Honors, I know it's a pile of paper in front of the Court, but it really is a simple matter that comes down to two questions from the Court. Question one, were the ABFR emails properly excluded by the District Court? Question two, whether or not counsel for the defendant at the time, Miller Kaplan, made improper and prejudicial remarks during summation? I submit that the District Court erred on both of those scores. As far as the ABFR emails are concerned, they were produced after discovery. However, they were produced before his deposition, and he was questioned on them. In addition to that, there were eight total depositions that occurred after discovery cutoff. The District Court's remedy to this was to allow witnesses to testify in a very limited fashion as to negotiations, sandisk, but not to testify with respect to any of the details in those emails. What is our standard of review? It's for abuse of discretion, correct? Yes, Your Honor. Okay. And with respect to the underlying litigation this arose out of, Miller Kaplan was an accountant in a royalty dispute between my client at Sandisk. They came up with these numbers that varied from $60 million in royalties, which at trial were determined to be five, and in that trial were found not to be independent auditors. That led to this suit. So with respect to the ABFR emails, they were incredibly detailed. They had a finalized redline contract, and the judge just completely excluded them. So the witnesses who could testify about them in reality were unable to do so. And we submit under R&R sales that the court should have found a less severe penalty because there was no willfulness, there was no bad faith, there was no fraud. The emails were produced as soon as they were discovered, and the witness in question was deposed. Now, I know my adversary says, well, the judge should have called somebody from Sandisk. There would have been no point in calling someone from Sandisk who also could not testify about the emails that she had excluded. It would have been the same thing as Mr. Athmer's email, conversation notes, negotiations, which were also excluded. That was highly prejudicial to PNY, and that completely affected the jury's verdict because, with respect to the verdict itself, the jury found that all of the elements were met with the exception of causation of damages. Those 12 emails and that red line go to causation. The jury found that they made false representations to PNY. The jury found that Miller Kaplan knew the representations were false. The jury found that Miller Kaplan intended to make the misrepresentations. The jury found that PNY reasonably relied upon the misrepresentations. The jury found that, finally, and this is where the jury verdict ends, that causation harm damages component was not proven. It was not proven because of the district courts not following R&R sales and not applying a less severe sanction, particularly in light of the fact that the chief witness on these emails was deposed. So his testimony was extraordinarily limited, and there's a lot of verbiage in the transcript and the record about this, but his testimony was completely circumscribed, and we would suggest the case should be reversed and remanded on that ground alone. Now, when it comes to the comment's summation, I have great respect for my adversary, but he knew exactly what he was doing. Judge repeatedly said, look, you can make comments during summation, but don't lie about anything that you know. And I hate to use the word lie, and I'm not going to use it here, but that's what she said. And if you look at the quotes from the summation, they don't simply apply to Sandisk, who I submit we couldn't have called anyway because they would not have been able to speak about the emails. But at one point, counsel says, but P&Y produces... Can you stand at the microphone, please, when you're speaking? Counsel says, but P&Y produces no evidence of any contract whatsoever, much less the terms might be. So the jury at summation is left leaving. There was no contract. There was no discussion of terms. Counsel, what effect on our analysis does it have that the Court offered to give some sort of limiting instruction to the jury, and I believe you declined that offer. Right. Your Honor, I don't think it has an effect on your analysis. I think that would have drawn even more attention to what counsel had said about this. She did at one point sustain my objection earlier on. And told the jury to disregard, and that was the offer again to say disregard this statement. And we presume that juries follow their instructions. So why shouldn't it bear on our thinking that the judge was willing to tell the jury to ignore these comments and you declined that? Because I made the objection. It was sustained. The bell had already been rung, and I didn't want to continue drawing attention to it. I agree with you. It was a strategic call on the second time around, but we already received one sustain. It was essentially the same statement, and I didn't want to keep jumping up and down with this. Frankly, I've tried, had the privilege of trying over 150 cases. This is the only time I've ever objected in a summation, and it was necessary because the comments were improper. They let the jury believe that either we were hiding something, which we weren't, or something existed that didn't have anything to do with damages or lost profits. Those statements are not true. And he knew the documents existed because he conducted a full deposition on them. So I would suggest to the Court that with respect to both of these issues, the Court should reverse and remand for a new trial. Unless the Court has any questions. You may reserve the rest of your time for rebuttal. Thank you, Your Honor. May it please the Court. My name is Stephen Tully. John Tully is at council table for Appelee, Miller, Kaplan, and Reyes. The reason we are here, Your Honors, is because of the appellant, P. N. Wise, repeated violations of Rule 26 of its discovery obligations and the orders of Judge Chesney. And I want to try to highlight just a few things that are in the record, but I don't believe were highlighted completely in the briefs. So we know that there was no disclosure of these e-mails in the Rule 26 disclosures. We know there was no disclosure of these e-mails in response to written discovery requests for production. We know that in May of 2016, that was the date in the scheduling order where discovery was cut off by Judge Chesney. Those e-mails had not been produced. In July of 2016, I took the deposition of the person P. N. Wise designated as most knowledgeable regarding their damages and with that was a request for production of documents concerning that. The e-mails were not produced. In October of 2016, two weeks before trial because of this late disclosure, I did depose Mr. Apfer. And beyond the fact that Mr. Apfer testified that he knew virtually nothing about these discussions, and I hope I'll have time to discuss that a little bit later, what he testified to was, in fact, there were other documents and e-mails that existed with respect to these discussions and these e-mails that were only disclosed two months before trial. You said two weeks earlier. Which is it, months or weeks? The deposition was two weeks before trial. The e-mails were produced two months before trial. Okay, gotcha. And at that deposition, when it was disclosed by Mr. Apfer, there were additional documents out there. My colleague who took the deposition pointed that out to counsel and requested they be provided. They were never provided. Now, also, at that July 2016 deposition of the person most knowledgeable regarding PNY's damages, I asked him, well, what are the damages? What's the computation of damages? And he couldn't answer. And, in fact, in the opening brief, PNY says that at page 14. Well, under Rule 26, there is a requirement to disclose a computation of damages. Even the case they cite, Bonzani, says that. At least in that case, in the Bonzani case, the plaintiff who hadn't disclosed the computations earlier made three supplements of the Rule 26 disclosures. In this case, PNY never supplemented their Rule 26 disclosures concerning the e-mails or anything else. And, in addition, this claim that is being discussed here that relates to the Apfer e-mails, according to the theory that PNY is now articulating, is that these e-mails evidence the so-called discussions about a sales relationship with SanDisk and that Miller Kaplan's audit caused SanDisk to cut off those discussions. And, according to their repeated comments in the brief, the judge's exclusion of these e-mails effectively dismissed their lost profit claim. So, the truth is that Judge Chesney let in abundant evidence about the lost profit claim. And among the evidence that she let in, despite the fact they had violated Rule 26 with respect to the computation of damages, was their experts' opinion that there was $13 million of damages caused by Miller Kaplan. And I just want to read real quickly part of the record here because I think it's important that we focus on the record, not statements that are unsupported by the record. This is at Further Excerpts of Record, pages 33 and 42. And this is Mr. Lane's examination of their expert, keeping in mind they're saying that these e-mails amounted to an effective dismissal of their lost profit claim. Mr. Lane's question. In turning to your opinion on lost profits, can you explain what the conclusion was that you reached and how you reached it? Answer, this is Mr. Tergelis, the expert. Yes, like I said earlier, my lost profit calculation is based on the lost value of a relationship with SanDisk starting. It would have been continuing that dialogue that was in the middle of 2011 that got shut down after the issuance of the Miller Kaplan report. Then we go to another question by Mr. Lane. Question. And what was your final lost profit damage numbers? Answer. For those two pieces, like I said, it's $13 million, as shown on my Schedule 1. Your Honors, we submit that all plaintiffs should be so lucky to have their damage claims effectively dismissed in this fashion when the jury was allowed to hear testimony of $13 million of damages that it was contended my client caused. And I would also note for the record that contrary to comments in the briefs and that we just heard, Mr. Apfer and Mr. Cohen both testified that there were, in fact, to this cutoff, meaning that the relationship or the discussions regarding the relationship were cut off as a result of Miller Kaplan. And that was in the e-mails, by the way. There was an e-mail that they wanted to submit in which a low-level person at SanDisk communicated to another low-level person at PNY that the discussions have been put on hold. Well, nevertheless, Judge Chesney allowed this information, this evidence to be before the Court. Now, also, and I have great respect for Mr. Lane as well, but I do believe the record here is very important. And statements have been made in these proceedings by PNY that are not supported by the record and are incorrect. One of them I just talked about, but I want to mention just three others. Number one, in their opening brief, the appellant's brief at pages 3 and 5, the statement is made that the only available documentary evidence of this supposed relationship were these e-mails. It's further stated at pages 27, 30, and 37 that the only documentary evidence to support the claim of lost profits were these e-mails. That is proven false by the record. Number one, ABFR testified at supplemental excerpt of the record 192 and 193. There were other documents and e-mails out there. Those were never produced. Number two, SanDisk. SanDisk was the supposed other party to these discussions. There were no SanDisk documents, no SanDisk witnesses that were ever introduced by PNY, but they were certainly available had this new claim and the e-mails been disclosed in a timely manner. Additionally, Mr. Tegeles, their expert, he got up on the stand, and he was allowed to show the jury, I think it was six different schedules, supporting the lost profit damage claim. Mr. Siano, the CFO of PNY, got up and, through him, introduced evidence of financial statements and financial data of PNY that had never been produced to us before trial, ever. That was introduced to support the damage claim. And Judge Chesney, over my objection, allowed that evidence to come in. And I would also just note, and it's in the brief, so I'm not going to beat this one, but if you look at page 29 of our brief, footnote 6, there are 12 different instances, 12 instances separate and apart from the e-mails, in which PNY violated their Rule 26 and discovery obligations. And that goes to attorney invoices we didn't get until trial. That goes to an attorney who was called that was never on the witness list. That goes to third-party vendor invoices. That goes to a market share claim. That goes to all. What would have been the prejudice, given what you've just said about all the other evidence that was available, what would have been the prejudice to your client had the court allowed the e-mails to be introduced? Well, Your Honor, those e-mails raised a whole plethora of other issues and evidence. And had they been disclosed in a timely manner, we could have dealt with them. But to answer your question directly, those e-mails disclosed three witnesses from PNY, Stuto, Wora, and Stone. I deposed Stuto, but there had been no disclosure of this claim or the e-mails at the time I did that. So we would have had to redepose Stuto, redepose Wora, and Stone. On the Sandisk side, two people to those e-mails. There was a Mr. Wong and a Mr. Tall. By the time of this disclosure, about two and a half years into this litigation, we couldn't even find Mr. Tall. And that's at Excerpts of Record 237. Other witnesses that allegedly go to these discussions. Sanjay Motra, he was the CEO of Sandisk that Mr. Cohen testified. Well, I had discussions with him about this sales relationship. We didn't have a chance to depose him. Additionally, in Mr. Alford's deposition, he testified, well, I was told that this decision to put the discussions on hold was made by executives at Sandisk. Well, we, those executives were never identified. And Mr. Alford didn't know who they were. Additionally, Mr. Alford testified that PNY attorneys were involved. Well, we didn't know, and he said, I don't know who the attorneys are. So we would have had to conduct discovery to identify the attorneys and then depose them about these supposed discussions. The other thing I just want to point out about Ms. Stuto. All the witnesses I've just testified, I've just mentioned. PNY made a decision not to call them. Ms. Stuto, on behalf of PNY, took the position that the draft contract, it was really terms and conditions that counsel just mentioned, was totally unacceptable. It was one-sided and gave PNY no rights. And that's at Supplemental Excerpt of Record 207 and 209. That's what Alford testified to at deposition. Not only was there never a contract or anything close to a contract, all there was was disagreement in this regard. Also, Mr. Brelsford. Mr. Brelsford was a representative and general counsel of Sandisk. He was deposed early on, in fact, by subpoena by PNY. Never once was he asked about these discussions, and we weren't told about these discussions, these emails, until a year later. And what was his testimony? His testimony was Sandisk refused to do business with PNY because of their multiple breaches, because of their bad faith, because of their, in his words, lies, and because they didn't trust them. So it makes perfect sense that PNY would not call Stuto, even though, and by the way, I believe it's at Supplemental Excerpt of Record page 56. Judge Chesney, in response to a question from Mr. Lane, said, you can call any witness you want, you just can't get into the emails. So they called Cohen, and Cohen testified to discussions about this agreement. He testified to negotiations. Of course, he said he wasn't involved in the negotiations. So a lot of evidence came in to suggest that they couldn't call Stuto to testify to this, or anybody else when Judge Chesney specifically said they could at page 56 of the SER is just completely false. Additionally, Counsel, you have just reached the end of your time, so you may have a sentence to sum up if you like. Thank you very much, Your Honor. We would simply request that the Court affirm Judge Chesney's order of denying the motion for a new trial. Thank you, Counsel. Mr. Lane, you've reserved rebuttal time. Thank you. So much of that is just not true. And I rely upon the record as well. And all of the colloquy in the record that we had over and over and over again about these emails. And Your Honor's question is an appropriate one. There is no prejudice. But he just restated here the same thing he told the jury. No SanDisk documents and no witnesses were produced. No documents from PNY, from SanDisk, no documents from PNY related to lost profits. He just did it again. We couldn't call SanDisk witnesses. They would have been circumscribed as well. Judge Chesney made that clear. And we had a total of four witnesses who were circumscribed by her ruling on the emails. Mr. Cohen, Mr. Affer, Mr. Siano, and, of course, Mr. Tregellos, who was the expert and gave a number. But he couldn't give the backup for the number because that were the emails and the red line. And Mr. Affer testified in his deposition that the deal was going forward. But there were two different houses within SanDisk, the business side of SanDisk, which we were partners with and looking to negotiate this agreement and had an agreement in the past. We were negotiating with them. And Mr. Affer said, you know, we're crossing the T's and dotting the I's away. On the other side of SanDisk were the lawyers, Mr. Brelsford. And they created the deal with Miller Kaplan's help, coming up with a fraudulent audit. That was shown in the first trial, and it was shown here. And the jury agreed with us both times that Miller Kaplan was not independent, that fraud occurred. Mr. Tregellos could not rely upon the emails or the red line. Mr. Affer couldn't do it. Mr. Cohen couldn't do it. And there was no prejudice to them, and they haven't identified a single bit of prejudice. There could have been a lesser severe sanction under R&R sales. He said there were no contract drafts and the contracts were so far apart. That's belied by the emails. As far as the summary exhibits that he said Mr. Siano was allowed to use that he had never seen before, there were summary demonstratives, financials that were long produced in the case that he had, and he knew that. And that's why Judge Chesney let them in. They didn't call it SanDisk. They didn't oppose SanDisk, even though the testimony in the record and in the depositions shows Miller Kaplan and SanDisk were hand-in-hand. They worked together for years, and the accountant in question here did more than 60 percent of his work for SanDisk. As far as other discoveries concerned, he talks about May 16, 2016, fact discovery cutoff. They didn't make their lawyers available for deposition until July 13 and 14. They didn't make the chief accountant available for deposition until August 19, merely months before the trial. With that, Your Honors, unless you have further questions, I again ask that you reverse and remand. Thank you, Counsel. I don't believe we have any more questions. Thank you. The case just argued is submitted, and we appreciate the helpful arguments from both counsel.
judges: Fernandez, Graber, Owens